Good morning. May it please the Court, Carol Carvajal from Pasa Cornelia Law Center on behalf of Petitioner. May we reserve two minutes for rebuttal, please?  Thank you, Your Honor. In this case, Petitioner's removal proceedings were so fundamentally unfair that he was denied a full and fair hearing, inasmuch as he was denied the opportunity to obtain legal counsel and the opportunity to present evidence. Let me say something. Why don't you just look at us and talk to us? You don't need to read that stuff. You know this case. If you're up there reading fast, it kind of flies. I apologize, Your Honor. I'm not sure I don't apologize. It's okay. So what's the bad deal here that your client got? He got a real deal, Your Honor. He was denied the chance to have legal counsel present him at the hearing. He also got denied to present evidence that would have corroborated his past persecution in former Yugoslavia. And that led to a finding of inquitability and frivolousness, which eventually led to the denial of his asylum claim. What do we do with the fact that the I.J. had granted a number of continuances at your client's request or through his former counsel, and the former counsel basically explained to the judge that there was a client communication problem or whatever you want to call it. And it put the I.J. in the position of, you know, how many continuances is enough? And at what point do I simply say to the petitioner, it's time to go to court here and hold the hearing? Yes, Your Honor. There were a number of continuances, but those continuances, as you pointed out, were at the behest of former counsel. The continuance that the petitioner requested was the opportunity to obtain counsel at the merits hearing. At the merits hearing, it was his fundamental right to have counsel represent him, because he did not have any chance and he did not have an opportunity to obtain new counsel for that hearing. Well, even though the I.J. had warned him several weeks before, because apparently at an earlier hearing, the I.J. had discerned that there was a problem between the client and the lawyer, and the I.J. had warned your client that if he was going to get a new lawyer, he better be prepared to proceed with the hearing two months later, and he wasn't. In fact, the evidence suggests to me that he kind of drug his feet on finding another lawyer and then showed up at the last minute and said, now I need another continuance. At what point do we declare that the I.J. is simply being unreasonable in refusing a continuance on a record like this? Well, Your Honor, I would disagree as far as stating that the petitioner had sufficient time to obtain new counsel. He actually was not informed that his counsel was withdrawn until July 30th. That's only 26 days before his 26 calendar days before the merits hearing. That's only about 20, 22-day business here. But doesn't the record also show that the lawyer tried to return the file to him and he wouldn't take it back? That, again, Your Honor, was on July 30th. Again, 26 days before the hearing. And that's our assuming argument that you want to take at face value everything that the former attorney said. Keep your voice up a little bit. No, I apologize. I'm interested in every word that you utter. The point I'm trying to make here, Your Honor, is that he did not have sufficient time to obtain new counsel because former counsel did not notify him that he was withdrawing with sufficient time for him to be able to obtain former counsel. As soon as the petitioner realized that he did not have counsel, he did try to obtain new counsel. He contacted Casa Cornelia on August 14th. That's the first time he had a legal screening with our firm. And then again on August 21st. For obvious reasons, Your Honor, our agency has many cases, and we can't immediately just jump into one case with a huge administrative record. We need time to prepare. And that's why the counsel at Casa Cornelia did offer to accept his case only if he could get a 30-day continuance in order to review everything that had been submitted so far and possibly perhaps supplement that record. Well, nobody is faulty. I mean, you did what any competent lawyer would do. You're not going to jump into a case that you don't have adequate time to prepare for. But the question that I'm wrestling with is why was it a legal error for the immigration judge on this record, faced with a number of prior continuances, faced with clear evidence that the client and the attorney were not getting along, in light of a warning to the client that you've got to be prepared to go at the next date that I'm setting here. And then the client comes in or the petitioner comes in and he's not ready. I mean, it's not your fault or the fault of the law office that you represent. The fault lies with the client. And at what point do we say to these immigration judges enough is enough or to the petitioner enough is enough? I would offer, Your Honor, that the fault was not with the client. Because the client did act as soon as possible to obtain new representation for the merits hearing. The fault may have, if there is fault, it may possibly be equally divided between the client and former counsel. What do we do with the record that shows these numerous appointments that his prior lawyer made with him and he shows up at the office and then he leaves? He's not willing to spend the time that she's set aside in order to help him prepare his case. Your Honor, she did explain that those times, it was not because the petitioner was not trying to cooperate with his case. It was because it was too difficult for him to relate the persecution he suffered in former Yugoslavia. He makes a reference that based on those times, she noticed that he needed to have some type of psychological evaluation. And that's why he was not able to assist her properly at that time. It wasn't through any attempt to delay his case or through any attempt to not cooperate with former counsel. That's why it was not his fault that he did not have counsel to represent him at the merits hearing. And even if he did... Let me ask you this. When his counsel filed a motion to withdraw six weeks before the merits hearing, right? Yes. And did your client receive a copy of that from his attorney? He did not, Your Honor. The record does not show that he received a copy of that motion to withdraw nor a copy of the immigration judge's decision on that motion. The record only reflects that... He never got a copy of the immigration judge's decision? No, Your Honor, he did not. Did he get it from... Well, did the lawyer send him a copy of the immigration judge's decision that he had six weeks before the scheduled merits hearing? No, Your Honor. The record does not reflect that he got notice of that. The record only reflects that on August 5th, the lawyer, former counsel, sent a letter to immigration court notifying them that on July 30th, she had attempted to notify Petitioner that she had withdrawn and that she had attempted to give him his file back. That's the first instance the record shows that Petitioner had noticed on July 30th. That's only 26 days before the merits hearing. Notice of what? That his lawyer was withdrawing? That she had attempted to notify Petitioner that she was withdrawing. July 30th is the first... What about the hearing in March where this whole lawyer-client problem came to the attention of the court? I mean, there's a colloquy on the record about the problems he was having at that time, right? Yes, Your Honor, the record does show some sort of discord going on at that time, and he did receive warnings that they should resolve the issue, but obviously Petitioner did not believe that that discord would eventually lead to his counsel withdrawing because up to six weeks prior to the merits hearing, he still believed that she was counsel of record. He had no prior notice. As far as the record shows, if there was any outside information going on, it's impossible for us to tell at this point in time. So even if you find that denial of the continuance was proper, it does become improper because the manner in which the IJA conducted the hearing was extremely prejudicial to Petitioner. The IJA not only bullied Petitioner to testify in English, which is not his first language, he also asked leading questions. He interrupted... Did you raise that issue with the BIA? I'm sorry, which... Was that issue raised with the BIA? Testifying... This issue that the IJA basically violated his due process rights to a fair hearing and didn't conduct a... Yes, Your Honor. I believe it was raised in the IJA, and the IJA made a reply to that. I'm sorry, to the BIA. To the BIA. Yeah, and the BIA did summarize all those issues in its decision on Administrative Record 2, page 2. Okay. So the immigration judge was unreasonable in conducting the hearing because he interrupted Petitioner over 80 times. I stopped counting at 80. asked leading questions, accused Petitioner of trying to confuse the court purposely by providing immaterial information, accused him of evasiveness, and severely reprimanded Petitioner when he cried while telling the horrible persecution he suffered in former Yugoslavia. As a matter of fact, the immigration judge could not have acted more like a prosecutor in this instance. He acted so much as a prosecutor that by the end of the proceedings, government counsel didn't have a single question to ask, didn't introduce a single piece of paper to controvert any aspect of Petitioner's testimony. He simply rested and had really nothing to add to the record. That's how much the immigration judge acted as a prosecutor. Because the immigration judge acted as a prosecutor, that created an environment that eventually led to the immigration judge finding Petitioner incredible. The immigration judge found Petitioner incredible based on what he claimed were inconsistencies between the oral testimony and the supporting documents that Petitioner had submitted. This court has determined many times that just because a petitioner provides more detail during the oral testimony does not mean that he is, per se, incredible. But that's exactly what the immigration judge did. He, just because Petitioner provided more detail during his testimony, he found Petitioner incredible. For example. Well, the application was in English. Yes, Your Honor. And does your client speak English? He does speak some English, Your Honor. He has learned English in former Yugoslavia, and he has continued to do so right here in the United States. For example, an instance where Petitioner provided more detail in the supporting documents was when he testified that when he was shot by police officers while he was driving his car, that his friend was shot. He said that during the testimony. The immigration judge asked him, why is it that you didn't say that your friend was shot? You do mention that your car was shot at. You do mention that incident, but you don't mention that your friend was shot at during your declaration that you submitted. And in the medical report. The medical report I would offer to you is that it's meant to corroborate physical evidence of Petitioner's own injuries. That may be the reason why he didn't mention anything about his examining physician. And also, the Petitioner specifically said, I did tell my former counsel about my friend getting shot that time. The immigration judge immediately dismissed that explanation based on the history that Petitioner and his former counsel had. Because the immigration judge. Well, you've covered all that in your brief. But no waiver of counsel was ever taken. No, Your Honor. It was not. Why don't you have a seat and we'll hear from the governor. Yes, Your Honor. May it please the court. Connor Dugan for the respondent. The IJ did not abuse his broad discretion when he denied the fourth motion for continuance after the Petitioner's own actions and lack of cooperation caused his former counsel to withdraw. Furthermore, a reasonable fact finder would not be compelled on this record to find the Petitioner credible. I'd like to turn first to the question of the right to counsel, if I may. First of all, a couple of things I'd like to clean up in terms of the factual record. In March of 2002, there was an immigration hearing, and at that hearing, counsel for Petitioner informed the IJ that there were problems dealing with the Petitioner, that he was not cooperating, that he would come to meetings and leave after a few minutes, and that they had not been able to develop the case. I believe the March 2002 hearing was after the psychological examination. So it wasn't just a question that his psychological problems were preventing sort of communication cooperation. This went beyond that. At that hearing, the IJ specifically warned the Petitioner that he needed to cooperate with his attorney, and the Petitioner agreed. And there was some discussion that if there continued to be disputes, Petitioner's lawyer might have to withdraw. So he was put on notice in March of 2002. At the end of June was when his former counsel sent a motion to the IJ asking to withdraw. In that motion, she notes that she had asked for consent from the Petitioner to withdraw. So he was at least on notice that she was thinking of withdrawing at that point. Then we have the August 5th letter of 2002, where she informs us that they had made a meeting at the end of July to discuss handing over the file. If she asked for consent, does it provide that consent was granted? No, he did not give consent, Your Honor. But I think it's another example. You've got to give us the full story, don't you think? Right, and I think it gives another example that he was... I can impeach you on that. Fair enough. That doesn't go to the heart of the matter. It doesn't go to the heart of the matter. I think it's another piece of the story that should be put out there, Your Honor. And the cases that Petitioner relies upon in his brief, I think, are inact. Those involve denials of continuance where for no reason, no fault of the Petitioner, continuance was denied for mere convenience of the court. And here that's not what the record shows. The record shows a continuing lack of cooperation on the part of the Petitioner. And then nine weeks, two months, over two months before his merits hearing, his attorney moved to be withdrawn from the case. Did the Petitioner know that? There's no indication that he received that letter from his attorney and then the order granting that motion. Did he get a copy of the motion? No, that was returned to sender, Your Honor, when we grant that. Who bailed the motion? Excuse me? Who sent the motion? The motion was from his former counsel. At that point, it was his current counsel asking him to withdraw. And then the order of the IJ was sent and returned. The Petitioner was, I think, in the first merits hearing in either month. But, I mean, who sent these out? Did the government send them out or did the lawyers send them out? Well, I believe we sent the order of the IJ. The record shows that it came back to the Executive Office of Immigration. I'm not sure about the actual motion of the attorney. The record just doesn't indicate. But, again, returning to the record shows that this person had notice of the motion of the attorney to withdraw. No, there's nothing on the record that specifically says that he had indication or notice of this particular motion. He did have indication that his attorney was going to withdraw. And he had been warned in the March 2002 hearing that he needed to cooperate with his attorney. Well, he knew that. Okay. But he didn't give his consent to that. He did not give a consent. And he never got a copy of the notice of motion? He did not, Your Honor. He also, he was informed that he had to update his address if he did move. Now, it's not clear whether or not it was because of the address. It simply says on the form that it wasn't deliverable. But that's just another piece of the puzzle. But here, this differs from the cases that the Petitioner cites in the sense that there is indication in the record that the Petitioner's own lack of cooperation is what caused the withdrawal of his attorney. Mr. Duggan, when did, I can't pronounce the last name of the Petitioner, when did he become aware that his lawyer wanted to withdraw at the hearing? No. In her motion to withdraw, she indicates that she had already spoken to him about her desire to withdraw. He had denied consent. But he was at least aware that it was a possibility at that point. Then they arrive at the hearing, I guess. What date is that hearing? That's August 26, 2002. Now, that's the merits hearing? That's not the merits hearing, is it? I'm sorry. There's a hearing in March 2002 where the attorney indicates that there's been a lack of cooperation. And then he's warned on the record that he needs to cooperate and agrees. And wasn't there an August 16 hearing or something? There's an August 26, which is the merits hearing. August 16, I believe, is the day that he meets with, I think, is the day that his motion for continuance is denied. And sometime in August, he meets with Casa Cornelia's attorneys. Well, now, then, August 16, when the motion for continuance is denied, is that when the lawyer's motion to be relieved is granted also? No, that was granted July 10, 2010. July 10. Yes. Did he get a copy of that? That was what was returned back to the Executive Office of Immigration. So on August 16, did he show up at a hearing on August 16? No, on August 26. He had moved on his own on August 16 for continuance. To get a continuance. That's right. Then was August 26 the day of the merits hearing? Was that the first time the record shows that he was aware he didn't have a lawyer? Well, he was aware at least 10 days before. The record also indicates that he knew at the end of July, because there's an August 5 letter from his former counsel saying she had tried to return a copy of the record on July 30. She wasn't there, but her partner was, and an associate in the office was there, and he refused to take it. So at least on July 30, and maybe before that point, he knew that he had come to get his record because his counsel had withdrawn. So there is indication that it was at least July 30, and perhaps earlier, that he knew for certain. At the end of June, he knew that his counsel was contemplating withdrawing. Contemplating. But when he knew that he did not have a lawyer, that she had been relieved, when did he know that? I think the record, if we take the assertion from the former attorney, would suggest that the fact that we know for sure, if we accept her assertion, is July 30. July 30. That's right. And the merits hearing is on the 26th. Of August. And he shows up, and then, what does he say, I want a lawyer? He does. He mentions at that hearing that he would like a lawyer, that he has a declaration from an attorney at Casa Cornelia. That's the one the lawyer says, I need about 30 days. That's right. She hadn't entered an appearance, but says, if a continuance of at least 30 days is granted, I will take this case. And what date was that again? That's August 26, 2002. Okay. And that's when he enters her declaration. So she wanted a 30-day continuance. Right. The record indicates that. What was so unreasonable about that? Well, the record indicates that the next time that the IJ even had an opening was in March of 2003. So a 30-day continuance was going to be many, many months. Now, the question isn't whether or not one of us would have granted that as an initial matter. The question is if the IJ abused his discretion in denying it. After a series of sort of events where the petitioner had failed to cooperate with his attorney, we would argue that it is not abusive discretion to deny this fourth continuance after there have been continuances granted, including the one in March. And at that hearing, the petitioner had been warned that he needed to cooperate with his attorney. We think this is sort of more akin to the Vides-Vides case where this court said that a four-month continuance and two separate continuances where the petitioner had failed to obtain counsel and then the IJ denied a continuance was not an abusive discretion. If I might just briefly. So a new counsel would have been ready in 30 days. That's right. But there's no room on the calendar. Well, there was room in March 2003, Your Honor. But again, it's not simply a question of the court's convenience. It's standing in the IJ's shoes and looking at the background of this case and what had occurred. I mean, it would be a different case if there hadn't been any indication of a lack of cooperation and sort of unreasonable delay on the part of the petitioner. This is a case where the petitioner's own actions seem to require the delay, and therefore it's not an abusive discretion. And who was the lawyer? The lawyer was Ms. Reyes. And the IJ had indicated that she had practiced frequently in front of him and that he knew her to be a competent counsel. And so that's in the record where the IJ indicates that he had. Was he a member of the California Bar? That I don't know, Your Honor. I assume so, but I don't know for sure. Well, you don't have to be a member of the California Bar to practice before the immigration court. So I don't know the answer to that. Isn't that right? I'm not aware. I think that's right, but I don't. Maybe it can be a disbarred lawyer practiced before the immigration court. Isn't that correct? I'm not sure, Your Honor. Is there anything in the record on her discipline? No, there's no indication of discipline in the record. No, I'm just asking. Okay, I thought maybe I missed something. No, I'm just asking some questions. You don't know these things? I don't know the answer to that question, Your Honor. How old are you? 28, going on 29. Well, I didn't know much at that age. I hope I know more by the age of 30. You will, you will. Does the court want me to address anything? I'll just see my time. I don't think so. You want anything more? No. Okay, thank you. Thank you. Are you from the – you came all the way from Washington? I did. Did you have a good trip? I did. Nice day here, huh? Beautiful. I would better not go back. I'd like to just reemphasize once again that Petitioner did not have counsel at his merits hearing through no fault of his own. If he was not cooperating with former counsel, it was only because of the psychological problems that he was experiencing at the time. And I'd also like to point out – How do we know that? Where is that in the record? On page 357, Your Honor, I believe that there's a psychological report indicating that he is suffering from post-PTS. How do we – where do we draw, then, the conclusion that his behavior vis-à-vis his lawyer was influenced by that? Your Honor, the lawyer, Ms. Reyes, does indicate on the record that the reason that she's having difficulty communicating with him is because of his mental state at the time. I believe that's indicated on page 211. And then it's also indicated on page – When you read that, do you have that in front of you? Yes, Your Honor. The first instance of that reference is on page 106. Try to speak a little slower. Yes, Your Honor. You've got so many things on your mind that they're just cascading out. On page 106 on line 11, she says, it was very difficult to get the information out of him, and this is one of the reasons we sent him to the clinical psychologist, and who also agreed that – and that's when she was interrupted by the immigration judge. So this is leading to her indication that his psychological problems is what is causing the difficulty in obtaining information. Then again on page 110, she makes a reference to his psychological – What is she saying there? The immigration judge asked what the nature of the problem is, and she says, I'm not sure what the nature is, but the respondent told me he couldn't think straight, and given that we do have psychological reports in the record, and my own dealings with respondents, leads me to believe that it may just be a condition that respondent has. So again, she's not saying he's not cooperating because he doesn't want to help his case, not because he is trying to delay the case. She's simply saying he's not cooperating because he's unable to do so because of his mental state at this point in time. Because of that – Read if you get a line or two from the psychological report. She said on page 106, line 11, it was very difficult to get the information out of him, and this is one of the reasons we sent him to the clinical psychologist, and who also agreed that – What's the clinical psychologist say? The clinical psychologist says that petitioner is suffering post-traumatic stress syndrome, which is inhibiting his daily life. She does – What? His daily life. She says that he has – I missed those words. Which was what? Inhibiting the normal – his normal life. Have you got that report there? Yes, Your Honor. It is on page 357. I was just summarizing, but she – Just read it. One example is Mr. Vladislav Javik is affected by unwanted intrusive recollection of the episodes of torture. He states that much of the time he's fine, and then suddenly he will remember what happened to him. He states, I try not to think about it. I try not to feel bad. So this points towards his inability to really think about what happened to him. That's why he's having the problems communicating what exactly happened to him in former Yugoslavia to Ms. Reyes at that time. So this just shows that it was not through his own fault that he was having problems cooperating with former counsel. I also like to add that he did not fail to obtain counsel for the merits hearing. He did, in fact, find counsel who was willing and able and ready to assist him, provided that he managed to get a 30-day continuance. Again, he did not get, assuming arguendo that everything in the record is taking its face value, the first instance that he got notice that he no longer had counsel was on July 30th. That's only 26 calendar days before the merits hearing. That's only about 20 to 22 business days to obtain counsel. That also is problematic for petitioner because at this time he does indicate that he's indigent, that he has no money. Without money, it would have been very difficult for him to just run out, get any attorney out of the phone book and say, come to court to me in 20 days. That's why he had to rely on a nonprofit organization to be able to assist him. So that points that it was really not through anything that he did wrong. Your organization provides free legal services. One hundred percent, Your Honor. How many lawyers are there? We have three staff attorneys, plus the attorney who is the executive director who does not take cases, and then the assistant director is also an attorney who takes cases now and then. Where does your funding come from? Various private donors and some organizations such as the California Endowment for the Endowment. California Endowment? Yes.  Thank you, Your Honor. Thank you. All right. Now we come to. . .
judges: Pregerson, Thompson, Tallman